Case No. 25-5291, Personal Services Contractor Association Appellant v. Donald J. Trump, President of the United States of America et al. Ms. Shapiro for the appellant, Mr. Davis for the appellate. Good afternoon, counsel. Ms. Shapiro, please proceed when you're ready. Thank you, Your Honor. May it please the Court, my name is Caroline Shapiro, and I represent the Plaintiff Appellant Personal Services Contractor Association. I'd like to reserve three minutes for rebuttal. This case arises from the same facts that you've just been discussing, many of the same underlying legal issues, and indeed, Judge Nichols wrote a single opinion. So as I've been listening to the argument from the other room, I do feel that I'm walking into the middle of a conversation. I will try to keep that in mind as we proceed. But the district court in this case made some of the same errors with respect to the PSCA as it made with respect to the unions. First, misapplying standing law. It artificially narrowed our injury, the actions we challenged, and our legal claims to individual contract-related job loss. Then it held that those claims had to be channeled by the Contract Disputes Act into a completely different administrative or a completely different dispute resolution regime from the CSRA that is analyzed under a completely different test from any of the channeling discussions related to the CSRA. Finally, it misstated and misapplied the preliminary injunction factors. All of this requires reversal. So I'll just start with standing and say to begin with, as you have been discussing, one of the district court's errors here was to disregard what we alleged to be the agency action, which is the shutting down of USAID. That's in the very first paragraph of our amended complaint. And instead said, well, we're going to slice and dice all the different actions that were taken in order to implement that decision and require you to establish some kind of redressable injury with respect to each one of those underlying individual actions. That is put another way. What they said with the district court and now the government accused us of is kind of trying to lump together a bunch of things that are actually different decisions into one big challenge. But we are not the ones doing the lumping together. That's the government. The government made a decision to shut USAID. It said it was going to shut USAID. And it proceeded to take all the steps it took in order to shut USAID. So in this kind of context, what's your perspective on how we should look at the relevant action to assess whether standing exists? And in particular, do we take the for the dismissal stage, do we take the plaintiff's assertions in the complaint as to what the relevant action is as a given? Or do we not do that? Do we peel a layer away and look behind that in some way? What's your perspective? I would say generally on the motion to dismiss stage, you would accept the plaintiff's assertions. We're also at the preliminary injunction stage, and we've submitted extensive evidence to establish that this decision was made at a very high level, at a very early stage within the administration, and that it was never deviated from. There is, of course, the final mission email, which our appendix is JA-259-63. That's dated March 28th. But there's lots of other evidence in the record dating back to early February to establish that defendants made this decision that USAID had to die. That's what Elon Musk said, for example. And that evidence is throughout the record that we've already created. I guess my question is less, was there such a decision in fact? Because that's something that's going to be determined. But for standing purposes, what do we assume the relevant action to be in judging whether the claim that's before us is one that ought to be channeled or not? Do we look to the — you're right in your complaint at the first paragraph. You say that there's a dismantling of USAID. And if the complaint says that there's a dismantling of USAID, and if you ask, well, is a challenge to a dismantling of USAID something that gets channeled, you might have an instinct to have one particular answer. But if you don't take that as a given and you look and you say, no, you just can't just take that as a given. You've got to ask, well, what actually visited the consequences being complained of upon the plaintiff? Then you might have a different frame of reference for how you decide whether something needs to be channeled. Can I separate the channeling for a minute from the standing question? Okay, sorry. No, no, but I understand the connection. I think the standing question I think is answered very clearly by Collins v. Yellen. Collins v. Yellen says, look, where there's an injury that has been caused by something that the defendant did, the plaintiff can challenge that injury on any basis, any underlying legal basis. It doesn't have to be — it's not constrained by the nature of the injury. To put it — to quote, it says, right, that the Article III standing requires only an injury traceable to the defendant's conduct, not to the provision of law that's challenged. And goes on to talk about how any injured plaintiff can bring a separation of powers or structural constitutional challenge. And in Collins, the actual injury was a pocketbook injury. The claim was that the people who made the decision that led to the pocketbook injury were unconstitutionally insulated from presidential removal. So I think the causal connection between our claim and our injury is actually much tighter than we saw in Collins. So I think you have to start there in thinking about whether or not there's standing. To — I would also add that there is also a kind of free enterprise axon here and now injury that's at play in these cases that I did not hear anybody talk about in the earlier argument. Part of the — Okay, so before we go to channeling, because that goes to channeling, right? I think it goes to both, actually. I mean, free enterprise is a standing case, but — I thought you were talking about here and now. I am. But the injury that axon said was important, that therefore shouldn't be channeled, was having these unconstitutional decision makers make the decisions about the plaintiffs. And that is — or the petitioners. That is also what's happening to us. There is an unconstitutional decision maker, the executive, deciding to dismantle a congressionally created agency and not to spend the money that Congress has appropriated on the things that Congress has directed it be spent on. So — And when you say us, are you talking about the organization or are you talking about the organization as an emissary for the individuals? Both. And does the distinction matter? I don't think the distinction matters in this case very much. I think associational standing is not even contested by the government in their briefs. It's clear that our members were injured by what happened. It's clear that the PSCA exists. Do you think that that doesn't have — the distinction between associational standing, the potential distinction between associational standing and organizational standing, you think it doesn't have any implications for this case, even with respect to channeling? I think organizational — if you think there's not associational standing, which even the government essentially concedes that there is, so that our only form of standing is organizational standing — let me rephrase that. If you — or if we have organizational standing, and I believe that we do, and I'm happy to talk more about that, that's an additional reason why it shouldn't be challenged because the PSCA is not a contractor and has no ability to seek contract remedies under the CDA. So that's what I'm wondering is, does the theory of standing, whether it's associational or organizational, affect the channeling inquiry? Do you think it matters for your purposes how — whether channeling is required, whether the standing is premised on organizational standing or associational standing? Because it's sounding like you're saying, well, we would get home either way on channeling, too, but we might have an easier time getting home on channeling if there's organizational standing as opposed to — I think I would — — in addition to associational standing, or am I misunderstanding? No, I think I would put it slightly differently. I would say we get home either way. There is no channeling, as I'm happy to talk about in a moment. We have one additional extra argument under organizational standing that we would add, but I don't think it actually makes our claim easier under organizational standing because it is so clear that we shouldn't be channeled in the first place. So the extra argument — so, for example, just to put it more concretely, imagine that USAID is fully dismantled, but most of the personal service contractors that you represent, or let's say all of them, are rehired by the State Department. Is there a remaining organizational injury to your client? Not. If so, what is the organizational injury and how is it — what's the extra argument? So the organizational injury goes in part to what happened when the USAID shutdown began. The PSCA, which had existed sort of internally as an employee interest organization — of course, it's not a union — had managed its archives. It had managed its communication with its members all on USAID platforms. It lost all of that with the shutdown. It lost its archives. It had to recreate everything from scratch, essentially create its own new website. And that may — those are pocketbook harms that still, I think, provide standing regardless of whether all members are rehired in a different — by a different department. I'm not sure I fully follow that because if the association exists to support an institution that exists, meaning USAID, and then that institution doesn't exist anymore, then the fact that you don't have the archives, why does it matter? Because there's nothing to support anymore. The institution — the organization exists to support the PSCs who work at USAID and exists to represent the interests of now former PSCs as well. So it is continuing to serve that attempt to fulfill that part of its mission, which has been impaired by the shutdown of USAID. Let's suppose the shutdown of USAID — of course you resist this, but let's suppose the shutdown of USAID is fine as a legal matter. Then what interest does the association have with respect to former PSCs? I think the — well, of course I resist the hypothetical.  It may very well have an interest in assisting former PSCs in continuing to find work in the humanitarian sector, in negotiating, in networking, in — to the extent that they do go work for other parts of the government with respect to how that might interact with their prior work. I mean, we haven't developed a record on that particular point, but those are some of the — some of the several ways I could imagine the PSCA would continue to have an interest. And the shutdown of USAID affects that continuing interest because there's — Because they've lost all of their — — resource materials that otherwise would be available that have been lost.  So with respect to the interaction between channeling and standing, the chief judge asked you, does it matter whether it's organizational versus associational for channeling purposes? And it seems to me, regardless of the theory of standing, if a case gets channeled, your client is still a union that has no contract, and therefore — Or an association with no contract. Or an association with no contract.  And it's the same regardless of the theory, right? You just don't have a contract to enforce before. We cannot go to the CDA — Yeah. Excuse me, to the — To the CFC. To the CFC. Under the CDA. Right, under any theory of standing. Regardless of the standing. Correct. So I'll say a word about — now, about channeling, unless there are further questions on standing. All right. Well, so first of all, I just want to reiterate that the channeling analysis for the CDA is completely different from the channeling analysis for the CSRA for many reasons. But there is clear precedent in this circuit as to how to determine when the CDA channels some claims, and that's Megapulse. Megapulse says very clearly that you look to two things. First, is the essence of the claim a contractual claim? That is, what is the source of the rights? And second, does the plaintiff seek contract-like remedies? So we here — neither of those tests are met here. Our claims have nothing to do with contracts. Our claims have nothing to do with the enforcement of any individual contract. They have to do with the Constitution and the APA. The nor do we seek contract-type remedies. The district court suggested that the only remedy we could get would be a contract-type remedy of reinstatement. But that's not what we seek. We are seeking compliance with the Constitution and the law. Can I test you on that score? So you are seeking other things, too, but in the complaint, in the amended complaint, there is in the prayer for relief a request for restraining defendants from enforcing and giving effective termination notices sent to USAID personal services contractors? Yes. So that piece of it, at least, sounds in reinstatement. It sounds in reinstatement, but it is conditional. It was conditional on the government coming in and saying, well, we're not going to shut down USAID, and here's how we're going to do it. I mean, at the point that we filed our amended complaint, PSCs were still employed. They were getting their notices, but they were still employed, and we were trying to preserve the status quo ante at that time. The government could have come in and said, oh, you're right, we're not — we shouldn't — we can't shut down USAID. We don't have the authority to do that. Here's how we're going to proceed, and that would have mooted that particular request for relief because it was entirely conditional on USAID continuing in our attempt to preserve the status quo ante. So you mentioned the Megapulse analysis, but we also have this Ingersoll-Rand analysis. If the question presented by the complaint could be phrased as whether the contract forbids termination under these conditions, then it's likely an action founded on the contract. I mean, it seems like it's at least possible to look at this suit that you're complaining about terminations of contracts for unlawful reasons, in other words, shutting down USAID, and so under Ingersoll-Rand, it would be — your claim would be channeled. Well, I think it's important to see Ingersoll-Rand in the context of what the CDA does and what it was created to do. What the CDA does is it says, look, when there are disputes between contractors and the government, what we want is for them to go to their contracting officer and try to resolve the dispute. And if they can't resolve the dispute, then there's this review process, either in the CFCA or the agency board — CFC or the agency board. And in Ingersoll-Rand, the issue there, right, was whether the particular contract could be terminated and rebid, and it had to do with the application of the FAR, but it was all very detailed, nitty-gritty stuff about how contracting operates. That's got nothing to do with this case. This case is about massive constitutional questions, and the idea that the first step would be to go to a contracting officer and say to a contracting officer, give me a written opinion about whether the agency that you work for can be shut down. It seems completely outside the realm of what a contracting officer's expertise is, and then, of course, the CFC or agency board's expertise. It also seems, frankly, kind of silly. I mean, it is the kind of thing that in Axon, just as Kagan said, it's just beggar's belief that these kinds of fundamental, even existential questions would be channeled in that case to a different kind of agency. But the court was very clear in that case that those kinds of large questions, it matters what the expertise of the agency is that it would be channeled to. It matters whether, but the bottom line is, do we really think that's what Congress was trying to do? And, in fact, it's pretty clear what Congress was trying to do with the CDA was rationalize what was a pretty chaotic system of contractors dealing with different agencies. Really, and that, I think, is what Ingersoll Rand speaks to. So you also said that we should remand to the district court to reassess in light of changed conditions because the dismantling of USAID has continued since the record, this record was compiled. Can you fill us in at all on, I mean, I know the record is the record, but just for our situational awareness, what the current conditions are? Have all the PSCs been terminated? Have any of them been rehired by state? I believe that all the PSCs have been terminated. I believe that some PSCs have found work in other parts of the government. Many have not. Many have not been able to find work in the humanitarian sector at all because the USAID shutdown had these much larger ramifications. It wasn't just a regular employment decision. It actually devastated the entire sector. There are a very small number of employees still at USAID who are currently working, as I understand it, and, again, this is not in the record, but as I understand it, they are working to wind down the remains of the agency. So are those folks who have to deal with, like, accounting or management or IT or that kind of thing? I don't have enough information to be able to really describe what I think they're doing, but my understanding is that they are winding down. And when you say some have found work elsewhere in the government, your sense is that that's not in international development work? I mean, there are 1,400 PSCs. I don't think I can represent to you what they have all ended up doing or even what any particular proportion have ended up doing. I do know that some have not found work. Some have not found work in the humanitarian sector. So that would have to be developed, which I'm sure we would be able to do. So on irreparable harm, it's, you know, where the injury, for example, is termination of employment, it's really hard to demonstrate irreparable harm. And you argue in your brief that, and this is sort of related to what you were just talking about, that the PSCs, many of them will not be able to continue in their careers because, as you mentioned, USAID is such a major sectoral player. And I wonder if they're in the existing record, which I understand is dated in some important ways, anything that we could rely on to assess whether that point is supported. You have this argument, the Humpty Dumpty argument that once it's taken apart, it can't be put back together again. It seems like we're sort of Humpty Dumpty's down off the wall now. Right. So I have a couple of answers to that question. First, there is no question that some of the irreparable harm that we warned about in our filings in the district court have come to pass and are indeed irreparable. But the irreparable harm is ongoing, and some of it can still be stopped. It might be harder to put an agency back together than it would have been at the time that we originally filed. But that doesn't mean that there aren't things that the court can do to require compliance with the law, to require compliance that USAID continue to be an independent establishment as Congress required, and that as part of that, that it have the ability to continue to obligate and spend and oversee the money and the programs that Congress has told it, has given it the responsibility to do. So there are still things to be done. They may be less effective or more cumbersome in many ways than it would have been a year ago, but the case is certainly, we certainly would not say that the irreparable harm is just over and done, and in the past it continues to be ongoing. I'm sure my colleagues don't have additional questions for you. Thank you. We'll give you some time for rebuttal. Thank you. Mr. Davis. May I please support? Tiberius Davis on behalf of the United States. This case is even easier than the one you just heard about because the district court denied a preliminary injunction sought well over a year ago, and that was not an abuse of discretion. Plaintiff seems to admit at reply brief six that their injuries all stem from the termination of the contracts and the loss of their members' employment. Yet they seek standing and relief that would reorganize and restructure the entirety of USAID without ever connecting the injuries to that redress. That is a problem for standing. It is also a problem for channeling. They don't get to attempt to artfully plead around that standing issue or the channeling issue by claiming constitutional or statutory claims under the APA. And Judge Pillard, unlike your dissent in Vought or in the Lake decision, there were no factual findings of a single agency action here. There was a record on the PI, and Judge Nichols ably explained why the different actions should be disaggregated for standing purposes. Now, the one claim that plaintiff might have to bring is related to the contracts that were terminated that injured their members. But the Contracts Dispute Act is Congress' attempt to channel implied and expressed contracts for personnel services through a particular mechanism through the Court of Claims. They've never denied that the contracts at issue that were terminated and that thus injured their members are those types of contracts. And even if they had constitutional claims, the Supreme Court in Elgin, in NIH, has channeled claims brought under the Constitution and the APA. This Court in AFG II has done the same. The First Circuit recently in Sustainability Institute has also done the same. There's no reason to divert from that. So I think, but even if this Court disagrees with us on the likelihood of standing and the likelihood of jurisdiction, the District Court also found a lack of irreparable harm based on the employment-related injuries under Sampson v. Murray. We don't think that that is an abuse of discretion. That alone is a basis to affirm the District Court. But even if the Court disagrees with all of that, we think the proper relief here would be to remand for a determination on the rest of the likelihood of the merits. And given the fact, and I think plaintiff agrees with this, that there's been a year and a half of changes to remand on the equities and irreparable harm. But at bottom, we think Judge Nichols' careful opinion correctly disaggregated the injuries and the conduct at issue and found no likelihood of standing and no jurisdiction. So briefly on the standing point, they tried to say that we narrowed their injury to just terminations. If you look at Reply Brief 6, that's what they say the injury to their members are. It is the loss of employment. On the organizational, I believe it's page 36 of their brief, they don't even really say what their injury is. I think arguably that's waived. And in Reply, what they talk about are these past injuries of difficulty contacting members and having to sort of provide them support. It's not apparent that those are ongoing. And they also say, well, we might stop existing. I heard them up here today indicate that they haven't stopped existing. But even so, that injury goes back to their members losing their jobs. Everything they talked about goes back to their members losing their jobs and sort of the kick-on effects of that. And I don't think just because they're an association, and this is to sort of some of Judge Pan's questions, that just because they're an association and not the actual members that they get out of the channeling, I think AFG-1 makes very clear their union was trying to bring claims. And this court said, you know, just because you don't have any claims that you could bring under the channeling, that just means Congress didn't want you to bring the claims at all. And I think that's the case here for PSCA. Now, obviously, their members can and I think have brought some claims. What about the theory you heard earlier in the argument that the shutdown of the agency, this goes to standing and organizational standing, the shutdown of the agency caused there to be unavailability of resources, of a data bank that would enable the association to help, for example, former PSCs find employment, things of that nature. And that harms the organization, core organization, and it results directly from the shutdown. I think two responses to that, Your Honor. One, I didn't see that in their briefs. And frankly, I was looking through some of the stuff below, and I didn't see that argument either. So I think that that's waived. Second, I think that would be an informational injury that they haven't argued here, and I think there's no statute requiring that. So I think they would have a hard time with the informational injury. And third, if that is something that helps. I don't know if it's an informational injury as such, because it's not information that the agency, whether required or not, I mean, I know that you could try to tether it to a statutory mandate to supply information. But it's not that there's a requirement to supply information. It's just that there's just a store of data that just exists, and now it's gone. I'm not sure. I mean, it does seem like they want access to that database for the information inside of it, and it seems weird that they would have additional standing in the absence of a statute mandating it. That seems kind of odd to me. Because their claim is different. Their claim is not like a FOIA claim. It's not a claim to information. It's a claim challenging the shutdown of the agency. And one of the ways that harmed them is it took away something that belonged to them, which was whether it's information or whether it's a box of money. It took away something that belonged to them. And so I don't think you have to go through the right to information analysis where that's the role that the loss of information is playing as injury in fact. I'm not sure I agree with that. But even so, again, I don't think they made that argument, and here or below. So I think that's waived. I think even if they did, then their injury would be to that precise conduct, and they might have standing to challenge that. But I don't think that would be standing to take down the entire restructuring. And we talked about this in the last argument, this question about the relationship between the injury and the framing of the claim. You know, plaintiffs argue that the contract terminations, that the loss of their informational resources, those are the injury that provide them with standing to raise a claim that is not a claim of contract breach. It's a claim of unlawfully shutting down USAID. And to rule on that claim, we don't need to interpret the contracts. We don't really even need to look at them. If we believe that they were PSCs and they've alleged that they've been let go, then we can evaluate a statutory or constitutional question. So I guess I'm asking you some of the same questions that I asked Ms. Welch. What is your authority for the notion that a different claim that might respond differently to the injury and fact that they assert in support of their standing is now, we should treat that as the claim that's being pursued and the only claim that may be pursued? So I take that to mostly be a standing question, although there were some channeling pieces to it. So my colleagues sort of stole some of my thunder with the Friends of Animals versus Bernhardt. I think they were challenging a single memo there, sort of like the final mission email they're pointing to here, saying that's evidence of this sort of single agency action. And the court at the standing inquiry said, no, no, there are discrete effects, discrete actions here. I think that's the exact same here. It's so different, though. Friends of Animals versus Bernhardt and CBD are cases in which the, so in Friends of Animals, the agency used to do sort of species-wide determinations about whether hunting would be advantageous or not. And they decided to change the way they did business. And they no longer did a notice and comment general rulemaking. They said, we're just going to do individual permit applications by adjudication. We're going to look at the information we had before, but we're just going to do individual permit applications. And the plaintiffs wanted to say, you have to do this by note. You have to do this in a big package. And the agency says, no, we don't. And that seems right, and that's just like in CBD, where what the plaintiffs were saying is, we want to challenge a whole aggregate of permitting for wells. But the unit of decision in both cases that the government had landed on was the well or the safari permit, not, or the take, you know, of the wildlife, not a larger thing. It wasn't like you've closed the entire safari program to us, or, you know, there wasn't an action. And here it's very different. The government has decided on their allegations, and that's where we are at now. The government has decided, we don't want to have AID as a freestanding. We want to do international aid in a different way in the State Department. That's the action. So I don't see in either of those decisions any authority for the idea that the court remakes the claim from something different from the unit that the government has done. The government in those cases has said, we're doing permit by permit. We're doing well by well. That's not what the government did here. It didn't say, we're only looking at each PSC and deciding who's good for us in the new world. That's not what they did. I think a lot of responses to that here, Honor. First, I think that sort of intermingles final agency action with standing. I think it's sort of a weird question about how that works, but that does seem to be something that happens. But the action, assume final action and assume it is the takedown of the agency. And I know you may dispute that on the merits. That's not where we're at. But we are. It's a preliminary injunction. Well, I'm asking about pleading and the claim, standing to bring the claim. That's not on appeal. This was a denial of preliminary injunction for likelihood that they do not have standing. So I think that's different. That's first. So on the preliminary injunction, they say evidence showing this intent to take the agency down, we're being harmed. And where is the authority for the court having to change the aperture? Like you claim you're bringing an APA constitutional claim, but you're not because you're contractors. And one of the components of the action that you've identified is termination of contracts. What is authority for that? I mean, when there's a challenge to remain in Mexico, you don't see the court saying, well, you sent a bunch of agents out, and you had to, you know, bring a bunch of, you know, staff away from where they used to process people in Mexico. I mean, you don't break it down. I think I just fundamentally disagree with you, Judge Pillar, because I do think that's. But I want to know why. So because I think Friends of Animals versus Bernhardt, they were saying, we think this change in how the agency is going about this is an agency action that we're challenging. I think in Lujan, this is at 568 of Lujan, the 1992 decision. They said that respondents also failed to demonstrate redressability. Instead of attacking the separate decisions to fund particular projects allegedly causing them harm, respondents chose to challenge a more generalized level of government action. So, again, in both Friends of Animals and Lujan, the plaintiffs were trying to say, well, there's this higher level of aid government action, and we're challenging that government action under the APA. And the court said, no, no, no, we can break that down and see where there's redress. And I think that's the exact same here. On the Lujan, it sounded like the problem was that if they took the challenge to the higher level action as a given and just said that as a consequence of that, redressability is hard to show. And I think that's part of what we're showing. Well, they said they're not redressable by the whole thing. Exactly. But it took the unit to use Judge Pillard's nomenclature. It sounds like from that passage, and I haven't gone back and looked at exactly at that, but just the way you recited it, it sounded like it took that unit as a given and said, therefore, there could be a redressability problem, which could be true. But it didn't then say, no, that's not the relevant unit. The relevant unit actually is a lower level. That is what the court says. It then says, this programmatic approach has obvious practical advantages, but also obvious difficulties in so far of proof of causation and redressability. As we have said in other contexts, suits challenging not specifically identifiable government violations of law, but the particular program agencies established to carry out their legal obligations are even within premise on allegations of several instances of violations of law are rarely if ever appropriate for judicial adjudication. So I do think that the courts can break them down permissibly. And I think to the extent this overlaps with final agency action, we think the state panel's decision in Lake and the panel decision from Vought were compelling. And to Judge Pillard, I know you dissented in both of those cases, but I took a main thrust of your dissents in those cases to be there was fact-finding there. There was a lot of evidentiary hearings saying, well, we're looking at all these pieces of evidence, and we're saying, and the judge, the district court was saying, based on clearly erroneous review, I think that there was a single agency action. And that's a big part of your dissents there. But here, this is preliminary injunction. There could be evidentiary determinations, but the district court didn't do that. It didn't say that there was a single agency action. Instead, it broke them apart. So I think on the PI standard, and especially given that, you can break them apart. And I think we obviously disagree that there's a single agency action. We fought that below. PSCs, for example, a majority of them were actually terminated in early February, and then others were terminated later in March 28th. So I think we can quibble about that. But I do think that that goes to standing. And then I also think the question of can we reframe their claims goes a little bit more to channeling, because that happens quite often in the channeling realm. In both AFGs, they were bringing APA statutory claims. In AFG2, which Judge Srinivasan, you were on, they were making constitutional and First Amendment claims. Those were channeled. Ahuja, Judge Pillard, similar thing there. I think if you look at the Supreme Court, I'm a little bit surprised that the other side is relying on NIH, because NIH at the jurisdictional stage, because this was about channeling, Judge Barrett split apart the guidance and the actual terminations of the grants. And even though for both of them they were bringing APA claims, including constitutional APA claims, Judge Barrett said, well, you can look at the guidance, but the grant terminations, those still have to be channeled. I think it's the exact same analysis here. I think Ingersoll Rand makes that clear, that just because you're sort of bringing a regulatory or statutory version of their claims doesn't mean that that doesn't get channeled. The other side talked a little bit about the type of relief at issue here, and I think Judge Srinivasan, you were right to point out that even in their amended complaint, they were asking for reinstatements, and now they're trying to say, no, no, no, we just want compliance with the statutes, with the Constitution. But if you look at their PI, they still ask for reinstatement of the PSCs. Now, they say that's contingent on the agency following the Constitution and the laws, but that's sort of the nature of the PI, is that it's contingent on – it's sort of in place preliminarily until there's sort of full compliance. So I think that is actually, at the end of the day, the redress that they are seeking. And if that's not the redress they're seeking, then I think that's a real standing problem. How does it redress the injuries of their members and of the organization if they're not even asking for a backpayer reinstatement for their members, if it's just the agency can do something else, like only – let's say in the previous case, they just bring back all the direct hires and don't do anything with the PSCs? But I think it's likelihood, right? It is. And so, I mean, if the agency gets reconstituted, then court would have to make an assessment of whether it's likely that there would be something of benefit in that to personal service. I think at the PI stage, likelihood of redress is a standing requirement, a burden that plaintiffs bear, and I don't think that they've shown that what they're asking for would have that. And I also think it's worth noting that in neither of their complaints, or obviously in the preliminary injunction that's on appeal, have they asked for vacature of a single agency decision. They've only been seeking injunctive relief. And I think there's going to be a real CASA issue there, too, which I think has some overlap with the standing problems. Can I ask one conceptual question about the relationship between the nature of the particular injury that's at issue and then the scope of the action? So, in NTEU, the on-bank case, which you will be familiar with, the issue has to do with the alleged dismantling of another agency. And at the panel stage, at least, the standing, I think the panel was unanimous on standing, and the existence of standing was predicated on, and if this is too far in the weeds and you're not familiar with it, I'm not expecting you to be up to speed on this. But as I recall, the existence of standing was predicated on the NAACP wanting some information that was statutorily, I think it was a statutory mandate, if I'm remembering right, statutory mandate that the agency would disseminate, and that information was of use. Should that case then not have been about, if that's the reason for standing, should that case then not have been about the dismantling of the agency? It should have been about something much narrower than that, if that's the injury that allowed the case to proceed. I mean, I think so, and we do disagree with the panel's determination that there was standing for the whole thing there. You disagree on standing, but I never recalled an argument that even if we're wrong, we being the government, even if we're wrong about standing, and standing exists for this reason, the scope of the dispute should be narrowed to just this. I don't think we made that argument there. I do think, obviously, then the final agency action determination said that these were all distinct final agency actions, and if that's sort of the unit by which we're measuring what the injury and what's caused by the injury, I don't see why, for the friends of animals and the Lujan reasons, why that wouldn't go to standing as well. So I think that it could be a standing issue there as well. But that would be the upshot of your theory is in that case, if that was the predicate for standing, then actually it shouldn't be a dismantling in the agency case. It should be only about the supply of this particular report. I think that's right. And I think there could be situations, I believe my colleague talked about this, hard to imagine who would be here, but there could be an end user who has multiple different types of injuries from different parts of the dismantling of the agency, and that they might have standing to bring a lot more things. But, again, I think there is an aspect of they were seeking vacature here, and neither the complaints or the PI are they seeking vacature or anything like that. It's all equitable. So that gets back to sort of the CASA point. The other side relies a lot on these separation of powers cases. They rely a lot on Collins. I'm still kind of surprised by that. I think Collins, frankly, helps us. So the court was very brief in discussing standing there, and it said, well, these shareholders, they have a pocketbook injury. That pocketbook injury, they said, was caused by the amendment, and essentially enjoining or undoing that amendment would give them redress. And the reason that they could challenge the amendment was because the directors had this unconstitutional removal protection. But they didn't say that means you can challenge everything that director did or that you could take the director away. And, in fact, when you get down to remedy, the court was very, very careful to say, well, this is really the only type of relief you could possibly seek, and even then we're going to remand for the district court to determine whether or not the president would have removed these people but for. So I think that really shows the injury. That's about remedy at the end of the day. That is, but the standing, I think, it's narrowed to the injury of the pocketbook injury caused by the amendment. And the reason the amendment was unconstitutional and that they could challenge it was based on this separation of powers issue. But the actual injury and the cause of it was from the amendment and the pocketbook injury. And I think that's very similar here. The actual injury is the loss of their jobs. That was caused by the termination of their PSCs. And, you know, they are seeking reinstatement, and that gets channeled through the CDA. And I think, obviously, as your honors know, the CDA has channeled before constitutional claims, statutory claims. Those are CSRA cases, but similar principle. I think California and NIH sort of show that, too, from the Supreme Court, that these sorts of channelings are common here. And obviously it can go to the court of the Federal Circuit at the end of the day. So I don't see any problem with channeling here. They focused on Axon and said that this is a similar here and now injury. I don't really get that because Axon was the process they had to go through themselves they were saying was unconstitutional. And Justice Kagan's point for the majority was, well, once that's completed, you've been injured and then there's nothing else to do. It's almost like it would be moot at that point. Clearly they don't think, even absent the PI, this case is moot. They think it should keep going. And it's not the process that is the injury here. It's, you know, all the sorts of agency actions. And, you know, one thing we haven't talked about in any of the cases, I would just – I mean, they're bringing a separation of powers claim. They're saying that, you know, Congress created this entity, approved it, prevented past legislation writers saying that it shouldn't be reorganized without consultation and made multiple appropriations for specific purposes. And that if the executive takes it down, you know, contrary to all of that, it's both statutory and constitutional violations that maybe they can't be undone. It's looking harder and harder. So I think a couple of response to that, Your Honor. We obviously disagree that we violate any statutes, but we can put the merits to the side. We did argue here, and we think it's correct, that what they're bringing are fundamentally statutory claims. They can't bring the separation of power claims. Those are statutory claims. They're claims that are major structural claims. And it is harder and harder to undo them, is it not? I think that cuts against them getting a P.I. for the equities and for irreparable harm. Because they're closing the barn door after the horse is out. So obviously we disagree that the agency is fully shut down. But if it were, if it were, if it were, is there no role for a P.I.? I don't think that a P.I. So, right, the point of a P.I. is there's irreparable harm. We're trying to stop it for the status quo now. It's been almost a year and a half then and quite a few differences. I think that question, if the court disagrees with the district court, which we think that's abuse of discretion, it should affirm. I think the Sampson v. Murray and the district court's analysis there is correct. But if the court disagrees, I think it should remand on that question to see if there's anything else being done that would make it different. Do you have anything, any information at all? I know it's off the record and, you know, we won't hold you to it, but just any for our situational awareness, what's going on? People being reemployed at state, programs being stood up, money being actually spent? So my understanding is there are under state, and we can get into the Federal Assistance Act on this, but there are programs that still exist that are still being funded. Some people, I don't know the exact number, have been hired at state for similar jobs. USAID still is an independent agency, and it still has employees. They're not doing a lot of the grant funding that they were doing before.  I'm not sure about any. Certainly a lot of that has been moved to state. And I think that that's well within the statute if you look at the Federal Assistance Act, which is getting, you know, more into the merits. Yeah, I don't know that we dealt. Just a general sense, yeah. Your sense is that there is an uptake of some of the people. That is my understanding, is that there is some uptake of some of the people. And there are certainly still programs and grants being funded. But I think at the end of the day, even if the court, again, disagrees with us on likelihood, and this is a PI, abuse of discretion, but if the court disagrees with us on likelihood of standing, on likelihood of jurisdiction, that they can still affirm purely on the lack of irreparable harm. And even if the court disagrees with that, we think it's most proper to remand so that the district court, given the year-and-a-half almost change, about a year over a year change, should reexamine irreparable harm, all the changes, the equities. I think even plaintiffs would agree with that, the scope of relief, things like that. But we do think the district court was right in its analysis here and that the court should affirm the denial of the PI. Make sure my colleagues don't have any additional questions for you. Thank you, counsel. Shapiro, I'll give you the three minutes. Thank you. I'd first like to answer your question, Judge Pillard, about evidence in the record related to the humanitarian sector. If you look at JA270-72 and 439-40, you'll see some unrebutted evidence in declarations. I'm sorry, what was the second one? JA439-440. And the first one was 270-272? Yes. I want to address just a couple of points. First, the point about Collins and the scope of remedy and what that has to do with standing I think is actually crucially important. It has nothing to do with standing. And we can see that if we look at SELA law. In SELA law, what the petitioners sought in that case was to take down the entire CFPB. Their injury was that they were being investigated. But what they asked for as part of the remedy was to take down the entire CFPB. Now, they didn't get that, but they didn't get that because the court found severability, not because they didn't have the right to ask for it or they didn't have standing to pursue the legal claims related to their injury. The reason I think we don't have examples of cases where we see this kind of separation of powers claim being adjudicated in the way that we're asking it to be adjudicated is because the facts of this case and some of the other cases you are dealing with right now are completely unprecedented and extraordinary. And I don't think that the speed and scope of the disregard of the law and the Constitution that the executive has been engaged in should reward the executive by removing judicial oversight. On the PI, whether it's abuse of discretion or not, as we argued in our brief, the district court made several legal errors in applying the PI standards, including insisting on some kind of certainty with respect to irreparable harm, including considering the executive's disagreement with congressional policy as a factor in the executive's favor, and by entirely failing to take into account the hundreds of thousands, if not millions, of deaths that were already taking place as a result of the shutdown of USAID. There are no further questions. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Pan